**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| MALIKA RILEY and TAKEEYA S. RELIFORD, individually and on behalf of all others similarly situated, ) ) ) ) | |
| Plaintiffs, ) ) | CIVIL ACTION NO.: _____ |
| v. ) ) | |
| OLIN CORPORATION, the BOARD OF DIRECTORS OF OLIN CORPORATION, the OLIN CORPORATION INVESTMENT COMMITTEE, and JOHN DOES 1-25, ) ) ) ) ) | |
| Defendants. ) ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Malika Riley and Takeeya S. Reliford ("Plaintiffs"), by and through their

attorneys, on behalf of the Olin Corporation Contributing Employee Ownership Plan (the "Plan"),[1]

themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the

Plan's fiduciaries, which include Olin Corporation ("Olin" or "Company") and the Board of

Directors of Olin Corporation during the Class Period[2] ("Board"), and the Olin Corporation

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.
[2] The "Class Period" is defined as November 9, 2015 through the date of judgment.

Investment Committee ("Investment Committee") and its members, for breaches of their fiduciary duties during the Class Period.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The U.S. Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."[3]

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

---

[3] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at n.3, available at A Look at 401(k) Plan Fees (dol.gov) (last visited October 14, 2021); *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

[4] *See also A Look at 401(k) Plan Fees*, at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.      Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

9.      At all times during the Class Period, the Plan had at least $587.4 million in assets under management. At the end of 2017, 2018 and 2019, the Plan had net assets of more than $826.9 million, $763.9 million, and $930.9 million, respectively, which were, and continue to be, entrusted to the care of the Plan's fiduciaries, including Defendants.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

3

11.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to adequately monitor and control the Plan's recordkeeping costs (2) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; and (3) maintaining funds in the Plan despite the availability of similar investment options with lower costs and/or superior performance.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and

Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**Plaintiffs**

17.    Plaintiff Malika Riley ("Riley"), resides in Manvel, Texas. During his employment, Plaintiff Riley participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.    Plaintiff Takeeya Sharonte Reliford ("Reliford"), resides in Macon, Georgia. During her employment, Plaintiff Reliford participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

20.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

21.     Olin Corporation, a Virginia corporation, is the Plan sponsor and a named fiduciary with a principal place of business being 190 Carondelet Plaza, Suite 1530, Clayton, Missouri 63105. *See* December 31, 2019 Form 5500 filed with the DOL ("2019 Form 5500") at 1.

22.     Olin's website describes the Company as "a leading vertically-integrated global manufacturer and distributor of chemical products and a leading U.S. manufacturer of ammunition. The chemical products produced include chlorine and caustic soda, vinyls, epoxies, chlorinated organics, bleach and hydrochloric acid. Winchester's principal manufacturing facilities produce and distribute sporting ammunition, law enforcement ammunition, reloading components, small caliber    military    ammunition    and    components,    and    industrial    cartridges." https://www.olin.com/investors/

23.     The Company, acting through its Board of Directors, appointed fiduciaries of the Plan, including the Admin. Committee and the Investment Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

24.     Olin, through its Board, had a fiduciary duty to monitor and supervise the Plan's fiduciaries, including the Investment Committee and its members during the Class Period, but, as set forth in detail below, the Investment Committee failed to carry out these fiduciary duties prudently.

25.     Olin also made discretionary decisions to make employer matching contributions to the Plan each year. Specifically, the Plan Document provides that Olin "may elect to provide a different rate of Matching Contribution or no Matching Contribution for all or any group of Active

Participants….." Olin Corporation Contributing Employee Ownership Plan Document, effective January 1, 2018 ("Plan Doc."), at Section 5.3.

26.     For the foregoing reasons, at all times during the Class Period, was Olin a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

**<u>Board Defendant</u>**

27.     Olin, acting through its Board of Directors, appointed Plan fiduciaries, including the Defendant Investment Committee and Non-Defendant Pension and CEOP Administrative Committee ("Admin. Committee"). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.     The individual members of the Board during the Class Period, who are not named as defendants, include the following: Heidi S. Alderman, Beverley A. Babcock, Gray G. Benoist, Donald W. Bogus, C Robert Bunch, Scott D. Ferguson, John E. Fischer, W. Barnes Hauptfuhrer, Randall W. Larrimore, John M. B. O'Connor, Richard M. Rompala, Joseph D. Rupp, Philip J. Schulz, Earl L. Shipp, Vincent J. Smith, Scott M. Sutton, William H. Weideman, and Carol A. Williams.

29.     The Board and/or the Compensation Committee of the Board has authority to determine the amount of employer contributions to the Plan. Specifically, the Investment Policy Statement, Olin Corporation, Contributing Employee Ownership Plan (CEOP) of March 31, 2019 (the "IPS"), provides: "Company contributions may be changed on a prospective basis by the action of the … the Compensation Committee of the Board of Directors or the Board of Directors." IPS, at 2. On information and belief, the Board exercised this authority during the Class Period.

30.    In furtherance of the Board's authority to appoint and its obligation to monitor the Plan's fiduciaries, the Investment Committee is required report to the Board at least annually. Specifically, the Charter of the Investment Committee, at 3, provides: "The Committee shall review the performance of the [P]lan investments with the Board at least annually."

31.    Accordingly, the Board and each of its members during the Class Period is or was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

32.    Plaintiffs reserve the right to amend their pleading to name as defendants the individual members of the Board during the Class Period.

**Investment Committee Defendant**

33.    Defendant Investment Committee is "the Plan's named fiduciary with respect to the selection of Funds and all other matters pertaining to the investment and management of Plan assets." Plan Doc. at Section 12.2.

34.    The Investment Committee has been delegated by the Board "the authority and responsibility for the investment and management" of the Plan's assets. Charter of the Investment Committee, at 1 (August 22, 2018). According to the Committee's Charter, "[t]hese responsibilities include … establishing investment guidelines" for the Plan, "appointing and removing investment managers, trustees, custodians, [P]lan consultants, actuaries and other advisors, participating in income generating programs such as securities lending and directed brokerage, and monitoring the performance of [P]lan investments and investment managers." *Id*.

35.     According to the IPS, the Investment Committee "is responsible for establishing the investment menu offered to participants under the Plan and monitoring the investment menu on an ongoing basis." IPS, at 2. Additionally, "[t]he Committee has the authority to oversee the investment of the Plan assets." *Id*.

36.     Pursuant to the IPS, the Investment Committee must "discharge its responsibilities under the Plan ***solely in the interest of the plan participants and their beneficiaries***." *Id*. (emphasis added).

37.     According to its Charter, the Investment Committee is comprised of three or more officers or employees of the Company who are appointed (and removed) by the Company's Chief Executive Officer at his or her discretion. Charter of the Investment Committee, at 2.

38.     Between August 2019 and March 2020, the members of the Investment Committee, who are not named as defendants in this action, included Todd A. Slater, V.P. and CFO, Teresa M. Vermillion, VP and Treasurer, Valerie A. Peters, V.P. Human Resources, and Eric A. Blanchard, General Counsel, who served as Committee Secretary. Plaintiffs do not have access to documents and information sufficient to identify other members of the Investment Committee during the Class Period.

39.     The objectives of the Investment Committee include complying "with ERISA fiduciary, prudence and due diligence requirements," and "monitor[ing] expenses of the investment options, benchmark vs. similar size plans' fees and overall recordkeeping and administrative services." IPS, at 3.

40.     The Investment Committee is charged with certain duties and responsibilities, including:

- Establishing, maintaining and reviewing the IPS;

- Ensuring a broad range of investment alternatives are made available to participants;

- Identifying and selecting a blend of well managed investment options for the Plan that offer an adequate diversified line-up;

- Monitoring the investment strategies, performance, and risk characteristics of the investment options on a regular basis including expenses;

- Ensuring that meaningful investment information and education is provided to all participants to allow informed decisions regarding investment risk, potential returns, and resulting impact on retirement savings;

- Evaluating services available to assist participants in meeting their investment needs; and

- Ensuring fees paid to service providers and other expenses are reasonable.

41.     On information and belief, the Investment Committee exercised this discretionary authority throughout the Class Period.

42.     Accordingly, the Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets. Plaintiffs reserve the right to amend their pleading to name the individual members of the Investment Committee as defendants in this action.

43.     As alleged in detail below, the Investment Committee failed to accomplish the objectives stated in the IPS, and failed to properly discharge its stated duties and responsibilities.

**John Doe Defendants**

44.     To the extent that there are additional officers, employees and/are contractors of Olin who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-25 include,

but are not limited to, Olin officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS

45.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 9, 2015 through the date of judgment (the "Class Period").

46.    The members of the Class are so numerous that joinder of all members is impractical. As of December 31, 2019, the Plan had 7,105 "participants with account balances…." 2019 Form 5500, at 2.

47.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

48.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

49.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

50.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

51.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

52.    The Plan is a defined contribution or individual account plan as described in Section 404(c) of ERISA and Department of Labor Regulations 2550.404c-1. IPS, at 2. Olin established the Plan as an employee stock ownership plan ("ESOP") "to provide eligible employees with long-term accumulation of retirement savings through employee contributions, employer contributions, as well as earnings." *Id*. The Plan also includes a Roth 401(k) component. Summary Plan Description, dated June 20, 2018.

53.    The Plan has undergone several amendments since it was established effective July 1, 1964, including a recent amendment and restatement effective as of January 1, 2018. Originally it was called the "Olin Employee Incentive Thrift Plan," but it was renamed "Olin Corporation Contributing Employee Ownership Plan," in June 1989.

54.    An "account" with respect to any participant in the Plan is the aggregate of his or her Tax Deferred Contribution Account, Roth 401(k) Contribution Account, Taxed Contribution Account, Company Contribution Account, Rollover Contribution Account, and such other accounts or sub-accounts as may be established by the Admin. Committee. Plan Doc. at 1.

55.    Retirement benefits provided by the Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions, less any expense that may be allocated to such participant's account.

56.    Non-Defendant Admin. Committee is a named fiduciary of the Plan. Plan Doc. at Section 12.6. The Admin. Committee has been delegated by the Board the "authority and responsibility for carrying out the administration of those Olin Corporation … tax-qualified employee benefit pension plans, as that term is defined in Section 3(2) of [ERISA]…"

57.     The Board has delegated to the Admin. Committee discretionary authority to:

    i.    Act as the plan administrator with respect to the Plan, and administer the Plan in compliance with its terms and applicable law;

    ii.    Interpret the terms of the Plan; and

    iii.    "Handle all fiduciary powers and responsibilities under applicable law, other than the investment and management of plan assets as expressly reserved to the Investment Committee or any other powers expressly reserved to another person, committee, or entity."

Charter of the Pension and CEOP Administrative Committee, at 1 (Aug. 22, 2018).

58.     Non-Defendant Benefit Plan Review Committee has been delegated authority and responsibilities by the Board over non-fiduciary or "settlor" functions for Olin benefit plans such as maintaining the tax-qualified status of the Plan and trust.

59.     Voya Institutional Trust Company ("Voya Trust") is the Plan's trustee and the custodian for the majority of the Plan's investments. *See* 2019 Auditor's Report, at 7.

60.     Voya Institutional Plan Services, LLC ("Voya"), which was previously known as ING Institutional Plan Services, LLC, is the recordkeeper for the Plan. *See* 2019 Auditor's Report, at 7.

*Eligibility*

61.     In general, any employee who is employed as a non-bargaining employee or a collectively bargained employee covered by a collective bargaining agreement, which provides for

14

participation in the Plan and is actively employed, being paid by Olin, is eligible to participate in the Plan. 2019 Auditor's Report, at 5.

### *Contributions and Vesting*

62.     Eligible employees are automatically enrolled in the Plan at a pre-tax contribution rate of 6%. Participants may elect to opt out of the Plan or select a lower or higher contribution rate. *See* 2019 Auditor's Report, at 5. The amount of the employer matching contribution percentage is determined annually by Olin. *Id.* Employer contributions vest over a period of five years of service, or as a result of death, disability or retirement. *Id*. at 6.

63.     According to the IPS, the amount of employer contributions "are made according to formulas which vary according to a number of factors including work location, FLSA status and union affiliation." IPS, at 2.

64.     Like other companies that sponsor defined contribution plans for their employees, Olin has enjoyed a significant tax and cost savings by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

65.     Olin also benefits in other ways from the Plan's matching contributions. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." Paychex, *Employer Benefits of 401(k) Plans*.[6]

### *The Plan's Investments*

66.     According to the IPS, the Investment Committee must "review the Plan's investment options on a regular basis – (quarterly reporting)." IPS, at 5. The Investment Committee

---

[6] Available at: https://www.paychex.com/articles/employee-benefits/employer-advantages-of-401k-plans

must review "[t]he performance of each investment option" offered by the Plan "compared against recognized appropriate indexes…." *Id.*

67.     The Investment Committee's review is required to focus on a number of factors, including:

- Net returns greater than benchmark over a full market cycle
- Performance in top 50% of peer group
- Fees reasonable for the most appropriate peer group
- Portfolio manager with tenure of three years or more
- Correlation to style or peer group
- Performance relative to assumed risk
- Minimum track record > three-year period
- Assets under management > $200 million

*Id.*

68.     If an investment option fails to satisfy the above criteria, the IPS requires that the Investment Committee either place it on a watch list for a probationary period during which it will continue to monitor the performance, or remove the investment from the Plan. *Id.*

69.     The IPS sets forth a three-tiered investment structure. Tier I is comprised of Lifecycle Target Date Funds; Tier II is described as a "Core Line-up" that is comprised of fixed income funds (stable value and bond funds), Domestic Equity (large cap index and SMID blend), International Equity (developed foreign), and Specialty (absolute return and inflation hedge); and Tier III is a self-directed option. IPS, at 4.

70.     Although the Investment Committee was required to adhere to the IPS, in actuality, as alleged below, it failed to prudently manage the Plan's investment options.

### *Payment of Plan Expenses*

71.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Trust Agreement: "[a]ll reasonable expenses incurred by or on behalf of the Plan and Trust … shall be paid or reimbursed from the Trust Fund." Master Trust Agreement

between Bank of America, N.A. and Olin Energy Company dated February 27, 2014 ("Trust Agreement") at 5.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

72.    As described above, Defendants were fiduciaries of the Plan.

73.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

74.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

75.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

### (1) Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses

76.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Nearly all

recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for defined contribution plans, especially those with significant assets.

77.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

78.     Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, available at: https://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited October 14, 2021).

79.     In this case, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping and administrative fees.

80.     According to recent Plan disclosures, each Plan participant is charged a quarterly "fee of $13 plus 1.5 basis points (or .015%) based on your adjusted quarter end account balance

will be deducted from your Plan account balance quarterly." Important Information About Your

Olin CEOP Account, at 5 (Sept. 2019).

81.    As demonstrated in the chart below, the Plan's per participant administrative and

recordkeeping fees were astronomical when benchmarked against similar plans.

| Year | Participants | Direct Comp. to Voya | Indirect Comp. to Voya | Fees Charged PP | Direct Comp State Street | Total Comp. | Comp Per Participant |
|------|--------------|----------------------|------------------------|-----------------|--------------------------|-------------|----------------------|
| 2015 | 7,214 | $336,394.00 | $462,074.00 | $(325,904.00) | $101,730.00 | $ 574,294.00 | $ 79.61 |
| 2016 | 7,480 | $801,908.00 | $503,637.00 | $(373,045.00) | $100,996.00 | $1,033,496.00 | $138.17 |
| 2017 | 7,577 | $866,642.00 | $617,847.00 | $(445,718.00) | $110,342.00 | $1,149,113.00 | $151.66 |
| 2018 | 7,650 | $928,653.00 | $584,689.00 | $(497,305.00) | $ 32,453.00 | $1,048,490.00 | $137.06 |
| 2019 | 7,105 | $473,105.00 | | $ (69,058.00) | $ 21,215.00 | $ 425,262.00 | $ 59.85 |
| 2020 | 8,801 | $425,150.00 | | $ (51,960.00) | $ 14,569.00 | $ 387,759.00 | $ 44.06 |

82.    The excessiveness of the Plan's recordkeeping and administrative expenses in the

above chart is readily apparent when compared to the what similar plans have paid for

recordkeeping and administrative costs.

83.    NEPC, a consulting group, recently conducted its 14th Annual Survey titled the

NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of

various defined contribution plan fees.[7] The sample size and respondents included 121 Defined

Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-

for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants. The

median plan had $512 million in assets and 5,440 participants. *See* Report at 1.

84.    NEPC's survey found that *no plans* with between 5,000 and 10,000 participants

paid *more* than $100 in per participant recordkeeping, trust and custody fees. *See* Report at 10.

---

[7] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

85.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[8]

86.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

87.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods*

---

[8] Case law is in accord that large plans can bargain for low recordkeeping fees. *See*, *e.g.*, *Spano v. Boeing*, No. 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, No. 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

*Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

88.     The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

89.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**(2) Many of the Plan's Funds Had Investment Management Fees in Excess of Fees for Funds in Similarly-Sized Plans**

90.     Another indication that Defendants employed a flawed fiduciary process is their failure to prudently select and monitor the Plan's investment options during the Class Period.

91.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

92.     As shown below, many of the Plan's investments were significantly more expensive than comparable funds found in similarly sized plans (*i.e.*, plans having between $500 million and $1 billion in assets).

93.     As noted above, the Investment Committee selects the various investment options made available to Plan participants. The following options were available to Plan participants as of December 31, 2019:

| TICKER | FUND NAME | VALUE | EXPENSE RATIO |
|---|---|---|---|
| ERASX | Eaton Vance Small/Mid-Cap Fund | $ 74,233,944 | 0.82 % |
| GBMSX | GMO Absolute Return Strategy Fund | $ 2,585,256 | 0.99 % |
| MWTIX | Metropolitan West Total Return Bond I | $ 45,689,077 | 0.35 % |
|  | NT S&P 500 Index | $150,859041 | 0.016% |
| PAAIX | PIMCO All Asset Instl. | $ 9,331,025 | 1.19 % |
| TRRAX | T. Rowe Price Retirement 2010 | $ 36,360,708 | 0.43 % |
| TRRGX | T. Rowe Price Retirement 2015 | $ 22,528,117 | 0.43 % |
| TRRBX | T. Rowe Price Retirement 2020 | $ 64,228,276 | 0.43 % |
| TRRHX | T. Rowe Price Retirement 2025 | $ 82,839,494 | 0.43 % |
| TRRCX | T. Rowe Price Retirement 2030 | $ 82,401,604 | 0.43 % |
| TRRJX | T. Rowe Price Retirement 2035 | $ 57,622,322 | 0.43 % |
| TRRDX | T. Rowe Price Retirement 2040 | $ 47,908,382 | 0.43 % |
| TRRKX | T. Rowe Price Retirement 2045 | $ 37,835,119 | 0.43 % |
| TRRMX | T. Rowe Price Retirement 2050 | $ 30,596,842 | 0.43 % |
| TRRNX | T. Rowe Price Retirement 2055 | $ 26,038,078 | 0.43 % |
| WFRSVD | Wells Fargo Stable Value Fund D | $ 45,727,700 | 0.50 % |
| WTIXBX | Templeton - Global Bond | $ 5,890,366 | 0.55 % |
| APHKX | Artisan International Value Instl | $ 46,628,208 | 1.01 % |

94.     If a participant fails to make any investment allocations, their personal contributions and any matching contributions will be invested in the Plan's "qualified default investment alternative" ("QDIA"), which has been selected by the Plan's fiduciaries, in accordance

with DOL guidelines. The applicable QDIA for any Plan participant who does not provide instructions on how to invest their savings is one of the T. Rowe Price age-based funds. The applicable T. Rowe Price Retirement date fund is determined based on the participant's date of birth. *See* Important Information About Your Olin CEOP Account, at 1 (Sept. 2019).

95. In January 2012, the DOL issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[9]

96. The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

97. As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet, at 1.

---

[9] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

98.     Investment options have a fee for investment management and other services. With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio that is based on a percentage of assets. For example, an expense ratio of 0.75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

99.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." *Best Practices for Plan Fiduciaries*, at 36, published by Vanguard (2019).[10]

100.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant. However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power. Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

101.    According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." *Best Practices for Plan Fiduciaries*, at 37.

102.    "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

process. For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services. It is important to understand the plan (*e.g.*, plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context. By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

103.    Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees. The Plan would have qualified for the collective trust versions of these funds (which were available since 2012) at all times during the class period, but it wasn't until 2019 that they moved the investments to the CIT versions of the T. Rowe Price funds.

104.    In the case of one Plan fund, the PIMCO All Asset Fund Institutional, its expense ratio was **119.42%** above the ICI *median* for its fund category. Another Plan investment option, the GMO Benchmark-Free Allocation Fund, had an expense ratio that was **111.81%** above the ICI median for its category. The Eaton Vance Small/Mid Cap Fund and the Artisan International Value Fund had expense ratios that, respectively, were **75.63%** and **67.55%** above the ICI medians for their fund categories. These excessively high expense ratios are detailed in the chart below:

ICI MEDIAN & AVERAGE EXPENSE RATIOS FOR
PLANS WITH $500 MILLION TO $1 BILLION

| FUND FAMILY | CURRENT IN-PLAN FUND | EXPENSE RATIO *BEFORE* MARCH 2019 | INVESTMENT STYLE | ICI MEDIAN | ICI Average |
|---|---|---|---|---|---|
| T. Rowe Price | Age Based Retirement Income 2010 | 0.54% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2015 | 0.57% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2020 | 0.61% | Target-date | 0.34% | 0.39% |

25

| | | | | | |
|---|---|---|---|---|---|
| T. Rowe Price | Age Based Retirement Income 2025 | 0.64% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2030 | 0.67% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2035 | 0.70% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2040 | 0.72% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2045 | 0.72% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2050 | 0.72% | Target-date | 0.34% | 0.39% |
| T. Rowe Price | Age Based Retirement Income 2055 | 0.72% | Target-date | 0.34% | 0.39% |
| PIMCO | All Asset Fund Inst | 1.01% | Balanced Non-Target Date | 0.28% | 0.35% |
| Artisan | International Value Fund | 1.05% | Int'l Equity | 0.50% | 0.54% |
| Eaton Vance | Small/Mid Cap Fund | 0.94% | Domestic Equity | 0.37% | 0.41% |
| GMO | Benchmark-Free Allocation Fund Class R6 | 0.92% | Balanced Non-Target Date | 0.28% | 0.35% |
| Met West | Total Return Bond Fund | 0.45% | Domestic Bond | 0.42% | 0.31% |
| Northern Trust Global Investments | NT S&P 500 Index | 0.140% | Index | 0.05% | 0.07% |

105.   Even after the Plan switched from the mutual fund versions of the T. Rowe Price Target Date funds to the collective investment trust versions of such funds, in or around March 2019, the expense ratios of these investment options was still significantly greater than the ICI median and ICI averages for such employing the same investment style, as detailed in the charts below:

ICI MEDIAN EXPENSE RATIOS FOR
PLANS WITH $500 MILLION TO $1 BILLION

| FUND FAMILY | CURRENT IN-PLAN FUND | EXPENSE RATIO *AFTER* MARCH 2019 | INVESTMENT STYLE | ICI MEDIAN |
|---|---|---|---|---|
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2010 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2015 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2020 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2025 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2030 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2035 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2040 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2045 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2050 | 0.43% | TARGET-DATE | 0.34% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2055 | 0.43% | TARGET-DATE | 0.34% |
| PIMCO | ALL ASSET FUND INST | 1.11% | BALANCED NON-TARGET DATE | 0.28% |
| ARTISAN | INTERNATIONAL VALUE FUND INST | 1.01% | INT'L EQUITY | 0.50% |
| EATON VANCE | SMALL/MID CAP FUND R6 | 0.82% | DOMESTIC EQUITY | 0.37% |
| GMO | BENCHMARK-FREE ALLOCATION FUND CLASS R6 | 0.99% | BALANCED NON-TARGET DATE | 0.28% |

106.    Likewise, even after the switch to the CIT versions of the T. Rowe Price Target

Date Funds, the high cost of the Plan's funds continued to exceed the ICI *average* fees of funds in

similarly-sized plans, as shown in the chart below:

ICI AVERAGE EXPENSE RATIOS FOR
PLANS WITH $500 MILLION TO $1 BILLION

| FUND FAMILY | CURRENT IN-PLAN FUND | EXPENSE RATIO *AFTER* MARCH 2019 | INVESTMENT STYLE | ICI AVERAGE |
|---|---|---|---|---|
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2010 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2015 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2020 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2025 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2030 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2035 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2040 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2045 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2050 | 0.43% | TARGET-DATE | 0.39% |
| T. ROWE PRICE | AGE BASED RETIREMENT INCOME TRUST F - 2055 | 0.43% | TARGET-DATE | 0.39% |
| PIMCO | ALL ASSET FUND INST | 1.11% | BALANCED NON-TARGET DATE | 0.35% |
| ARTISAN | INTERNATIONAL VALUE FUND INST | 1.01% | INT'L EQUITY | 0.54% |
| EATON VANCE | SMALL/MID CAP FUND R6 | 0.82% | DOMESTIC EQUITY | 0.41% |
| GMO | BENCHMARK-FREE ALLOCATON FUND CLASS R6 | 0.99% | BALANCED NON-TARGET DATE | 0.35% |

107.    Given the excessive costs of the above funds they should have been replaced during the Class Period. Instead, defendants retained many of these funds and belatedly switched to the collective trust versions of the T. Rowe Price Age-Based Retirement funds in 2019, however, by that point participant losses were already baked in.

(3) **Defendants Retained at Least One Underperforming Fund in the Plan from 2014 to 2020**

108.    Another indication of Defendants' lack of a prudent process to monitor Plan funds during the Class Period was their failure to remove the Eaton Vance Small/Mid Cap Fund, which

consistently underperformed both its benchmark index and lower-cost funds in the same category that measured their performance against the same benchmark index.

109.    The Eaton Vance Small/Mid Cap Fund underperformed as follows as of June 30, 2020:

| FUND | NET EXPENSE RATIO | AVERAGE ANNUAL RETURN | | |
|---|---|---|---|---|
| | | 1Y | 3Y | 5Y |
| ERASX EATON VANCE SMALL/MID CAP FUND R6 | 0.82 % | 43.02 % | 15.62 % | 16.10 % |
| Benchmark Relative Performance | | -0.60 % | -6.51 % | -4.16% |
| | | | | |
| NCTWX NICHOLAS II I | 0.60% | 37.56 % | 17.34 % | 17.21 % |
| Benchmark Relative Performance | | -6.06 % | -4.79 % | -3.05 % |

110.    As detailed in the chart above, the less expensive comparator fund, Nicholas II I, outperformed Eaton Vance Small/Mid Cap Fund over the critical 3- and 5-year periods during the Class Period. A prudent fiduciary should have been aware of better preforming lower-cost alternatives and replaced the Eaton Vance Small/Mid Cap Fund with a lower-cost, better performing alternative. Defendants' failure to do so is a clear indication that the Plan lacked a prudent process for monitoring the cost and performance of the funds in the Plan.

111.    Given the clear underperformance of the Eaton Vance Small/Mid Cap Fund relative to its benchmark during the last five years, and its above-median and average expense ratio, it should have been replaced during the Class Period.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duty of Prudence**
**(Asserted against the Investment Committee)**

112.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

113.    At all relevant times, Defendants Investment Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

114.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

115.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

116.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

117.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable

relief and other appropriate relief for the Prudence Defendants' breaches, as set forth in their Prayer for Relief.

118.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against the Board and Olin)**

119.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

120.    The Board Defendants and Olin (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

121.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

122.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

123.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated; and

(c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

125.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: November 9, 2021                    **CAREY AND DANIS**

                                          /s/ *James J. Rosemergy*                    .
                                          James J. Rosemergy
                                          8235 Forsyth Blvd., Suite 1100
                                          Clayton, MO 63105
                                          Tel.:  314-725-7700
                                          Fax:  314-721-0905
                                          jrosemergy@careydanis.com

                                          **EDELSON LECHTZIN LLP**
                                          Eric Lechtzin, Esquire
                                          (Fed. Bar I.D. # 62096PA)
                                          (*Pro Hac* Admission to be Requested)
                                          Marc H. Edelson, Esquire
                                          (PA Attorney ID # 51834)
                                          (*Pro Hac* Admission to be Requested)
                                          3 Terry Drive, Suite 205
                                          Newtown, PA 18940
                                          Telephone: (215) 867-2399
                                          Facsimile: (267) 685-0676
                                          elechtzin@edelson-law.com
                                          medelson@edelson-law.com

                                          **CAPOZZI ADLER, P.C.**
                                          Mark K. Gyandoh, Esquire
                                          PA Attorney ID # 88587
                                          (*Pro Hac* Admission to be Requested)
                                          312 Old Lancaster Road
                                          Merion Station, PA 19066
                                          markg@capozziadler.com
                                          (610) 890-0200
                                          Fax (717) 233-4103

Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Pro Hac* Admission to be Requested)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

*Counsel for Plaintiffs and the Putative Class*