UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MALIKA RILEY, et al., | ) |
| | ) |
| Plaintiff(s), | ) |
| | ) |
| v. | ) Case No. 4:21-cv-01328-SRC |
| | ) |
| OLIN CORPORATION, et al., | ) |
| | ) |
| Defendant(s). | ) |
| | ) |

**Memorandum and Order**

The Employee Retirement Income Security Act of 1974 imposes a duty of loyalty on fiduciaries of certain investment plans. Malika Riley and Takeeya Sharonte Reliford participated in one such plan through their employer, Olin Corporation. Believing that Olin Corporation, Olin's board, and the plan's investment committee breached their fiduciary duties, Riley and Reliford filed this class-action lawsuit. The Defendants move to dismiss the complaint against them, arguing that the complaint's allegations, even if true, fail to state a claim. The Court agrees and grants the motion.

**I.    Background**

For purposes of the motion to dismiss, the Court accepts as true the following well pleaded facts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Created in 1964 by the Olin Corporation, the "Olin Corporation Contributing Employee Ownership Plan," an "individual account plan" or "defined contribution plan" under ERISA, 29 U.S.C. § 1002(34), establishes various investment accounts for participating Olin Corporation employees. Doc. 1 at ¶¶ 52–54. Olin and its board appointed an investment committee to serve as the plan's named fiduciary regarding investment and management of plan assets, while a

separate administrative committee serves as the plan's administrator and as a named fiduciary in all matters other than investment and management of plan assets. *Id.* at ¶¶ 33–43, 56–58. Voya International Trust Company serves as the plan's trustee and custodian for most of the plan's investments, and Voya International Plan Services keeps records for the plan. *Id.* at ¶¶ 59–60. At the end of 2019, the plan held over $930,000,000 in net assets and had over 7,000 participants. *Id.* at ¶¶ 9, 46.

Plaintiffs Malika Riley and Takeeya Sharonte Reliford both participated in the plan during their employment with Olin. *Id.* at ¶¶ 17–19. The complaint alleges in count 1 that the investment committee breached its fiduciary duty of prudence and in count 2 that Olin and its board failed to adequately monitor the investment committee. *Id.* at ¶¶ 112–25. In support of count 1, the complaint contends that the investment committee failed to adequately monitor the plan's recordkeeping expenses, *id.* at ¶¶ 76–89, failed to prudently select investment options because of excessive investment fees, *id.* at ¶¶ 90–107, and retained at least one underperforming fund in the plan, *id.* at ¶¶ 108–11. Thus, alleges the complaint, "the totality of circumstances demonstrate that the plan fiduciaries failed to administer the plan in a prudent manner." *Id.* at p. 17.

In support of their specific contention that the investment committee fails to control the plan's "recordkeeping expenses," "a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's 'recordkeeper,'" Riley and Reliford make several allegations. *Id.* at ¶ 76. According to the complaint, "[r]ecordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing." *Id.* at ¶ 77. They say that the revenue-sharing fee model selected by the investment committee allowed recordkeeping fees to balloon. *Id.* at ¶ 79.

According to the complaint, the plan paid $79.61, $138.17, $151.66, $137.06, $59.85, and $44.06 per plan participant, per year, from 2015 to 2020, respectively. *Id.* at ¶ 81. The complaint compares these "astronomical" fees to a survey conducted by NEPC, an investment consulting firm, of 121 defined contribution plans. *Id.* at ¶¶ 81–83; *see also* Doc. 20-3. That survey found that in 2018 "*no plans* with between 5,000 and 10,000 participants paid *more* than $100 in per participant recordkeeping, trust and custody fees." *Id.* at ¶ 84. The 121-plan sample consisted of 71% corporate plans, 20% healthcare plans, and 9% not-for-profit and other plans, with an average $1.1 billion in assets and 12,437 participants and with a median $512 million in assets and 5,440 participants. *Id.* at ¶ 83. The complaint also claims that "some authorities" recognize $35 per participant as the average amount large plans should pay in recordkeeping fees. *Id.* at ¶ 85 & n.8. The complaint faults the investment committee for failing to conduct regular requests for proposal to identify more economical recordkeepers and for failing to leverage the plan's significant assets to negotiate a better deal on recordkeeping costs. *Id.* at ¶¶ 86–89.

Further supporting count 1, Riley and Reliford allege that many of the plan's funds charge excessive investment-management fees as, based on "the ICI median and ICI averages," "many of the [p]lan's investments were significantly more expensive than comparable funds found in similarly sized plans." *Id.* at ¶¶ 90–92, 103–06. The complaint also alleges that "the Defendants could not have engaged in a prudent process" because the plan maintained several T. Rowe Price mutual funds despite the availability of cheaper, collective trust versions of the funds (which the plan eventually switched to). *Id.* at ¶ 103.

Riley and Reliford also claim that from 2014 to 2020 the investment committee imprudently retained at least one underperforming fund in the plan, the Eaton Vance Small/Mid

3

Cap fund. *Id.* at ¶ 108. To demonstrate this, Riley and Reliford compare the Eaton Vance Small/Mid Cap fund's expense ratio and average annual return with another fund, the NCTWX Nicholas II I fund. *Id.* at ¶¶ 109–11. The comparison shows that the Eaton Vance fund had an expense ratio of 0.82% compared to the Nicholas II I fund's 0.60%. *Id.* at ¶ 109. As of June 30, 2020, the Eaton Vance fund's one-year, three-year, and five-year average annual returns were 43.02%, 15.62%, and 16.10%, with benchmark relative performance of -0.60%, -6.51%, and -4.16%, respectively. *Id.* On the other hand, as of June 30, 2020, the Nicholas II I fund's one-year, three-year, and five-year average annual returns were 37.56%, 17.34%, and 17.21%, with benchmark relative performance of -6.06%, -4.79%, and -3.05%, respectively. *Id.*

In support of count 2, the complaint points both to the investment committee's alleged failures, as well as to Olin and its board's obligation to monitor the investment committee. *Id.* at ¶¶ 119–125. Collectively, Riley and Reliford estimate that the Defendants' alleged, unlawful conduct has cost the plan millions of dollars. *Id.* at ¶ 12. The Defendants now move to dismiss the complaint in its entirety, arguing that Riley and Reliford do not allege "meaningful benchmarks" against which to evaluate the Defendant's fiduciary process and do not allege facts supporting an inference that the Defendants breached their fiduciary duties.

## II.  Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the plaintiffs to give "a short and plain statement of the claim showing that the pleader is entitled to relief." To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

4

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). This requirement of facial plausibility means the factual content of the plaintiffs' allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff . . . ." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (citation omitted); *Iqbal*, 556 U.S. at 677–78.

### III. Discussion

The Defendants move to dismiss the entirety of Riley and Reliford's complaint for failure to state a claim. Against Riley and Reliford's count 1, Defendants argue that none of Riley and Reliford's three proffered theories—that the investment committee imprudently allowed excessive recordkeeping fees, allowed excessive investment-management fees, and maintained

5

an underperforming fund—can support a breach-of-fiduciary-duty claim. Following this, the Defendants then argue that count 2 fails by implication. The Court addresses these arguments in turn.

### A. Breach-of-fiduciary-duty claim

ERISA imposes a duty of prudence on plan fiduciaries like Olin's investment committee. The committee must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "This statutory duty of prudence establishes 'an objective standard' that focuses on 'the process by which' decisions are made, 'rather than the results of those decisions.' A prudently made decision is not actionable, in other words, even if it leads to a bad outcome." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009)).

At the motion-to-dismiss stage, the complaint suffices if the Court can "infer from what is alleged that the process was flawed;" the complaint need not "directly address[] the process by which the [p]lan was managed." *Braden*, 588 F.3d at 596. In this "context-specific inquiry," *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 740 (2022), "'[c]ircumstantial allegations about the fiduciary's methods' based on the 'investment choices a plan fiduciary made' can be enough." *Davis*, 960 F.3d at 483 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)). However, plaintiffs alleging a breach of fiduciary duty with circumstantial allegations must "provide a sound basis for comparison—a meaningful benchmark" to show that a prudent fiduciary in like circumstances would have acted differently. *Meiners*, 898 F.3d at 822.

6

### 1. Recordkeeping fees

As previously described, the complaint alleges that the revenue-sharing fee model selected by the investment committee allowed recordkeeping fees to balloon. Doc. 1 at ¶ 79. The complaint compares the plan's "astronomical" recordkeeping fees to a survey conducted by NEPC, an investment consulting firm, of 121 defined contribution plans. *Id.* at ¶¶ 81–83. That survey found that in 2018 "*no plans* with between 5,000 and 10,000 participants paid *more* than $100 in per participant recordkeeping, trust and custody fees." *Id.* at ¶ 84. The complaint also claims that "some authorities" recognize $35 per participant as the average amount large plans should pay in recordkeeping fees. *Id.* at ¶ 85 & n.8. The complaint also faults the investment committee for failing to conduct regular requests for proposal to identify more economical recordkeepers and for failing to leverage the plan's significant assets to negotiate a better deal on recordkeeping costs. *Id.* at ¶¶ 86–89.

The investment committee argues that these allegations fail to state a breach-of-fiduciary-duty claim. First, the committee argues that revenue sharing does not imply imprudence, Doc. 20 at pp. 5–6, and second, that the NEPC survey data is not a meaningful benchmark, *id.* at pp. 6–8. Third, the committee argues that the authorities on which Riley and Reliford rely to establish a $35 recordkeeping-fee average likewise fail as an apt comparison. *Id.* at pp. 8–9. And finally, the committee urges the Court to reject as the basis for a claim Riley and Reliford's "speculation" that the committee fails to conduct periodic requests for proposal. *Id.* at pp. 9–10. Ultimately, the investment committee says that Riley and Reliford fail to identify any flaw in Olin's decision-making process that would allow the Court to infer misconduct. *Id.* at p. 10.

The Court agrees with the investment committee. First, Riley and Reliford acknowledge that "a revenue sharing approach is not imprudent per se." Doc. 1 at ¶ 78. In fact, revenue

7

sharing, a "common and acceptable investment industry practice[e]," "frequently inure[s] to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (internal quotation marks omitted).

Second, courts throughout the country routinely reject the 2019 NEPC survey—among others—as a sound basis for comparison because it lacks in detail. *See, e.g.*, *Perkins v. United Surgical Partners Int'l Inc.*, No. 3:21-cv-00973, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1303–04 (D. Minn. 2021); *Mator v. Wesco Distribution, Inc.*, No. 2:21-cv-403, 2022 WL 1046439, at *7 (W.D. Pa. Apr. 7, 2022). To plead a meaningful benchmark, "the plaintiff must 'plead that the administrative fees are excessive in relation to the *specific services* the recordkeeper provided to the *specific plan* at issue.'" *Perkins*, 2022 WL 824839, at *6 (quoting *Wehner v. Genentech, Inc.*, No. 20-cv-6894, 2021 WL 2417098, at *5 (N.D. Cal. June 14, 2021)). "[T]he 2019 NEPC survey does not contain any information about the services provided to the surveyed plans. Thus, the Amended Complaint [contains] an incongruent comparison." *Mator*, 2022 WL 1046439, at *7.

Riley and Reliford respond that, at the motion-to-dismiss stage, the Court cannot determine whether the 2019 NEPC survey suffices as a benchmark. Doc. 23 at p. 14. Not so. At this stage, the Court accepts as true the survey's findings as alleged. The survey considered the recordkeeping, trust, and custody fees charged by a limited sample of investment plans of various types and sizes without spelling out, in any degree of detail, the services the plans received in return. For this reason the Court need not accept as true Riley and Reliford's legal conclusion that the survey serves as a meaningful benchmark against which to weigh the investment committee's actions. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78. Because the survey provides information only at a high level of generality, the Court cannot accept it as a

8

meaningful benchmark. *Meiners*, 898 F.3d at 823 (concluding Meiners failed to plead a meaningful benchmark by alleging only "that cheaper alternative investments with *some* similarities exist"); *see also Davis*, 960 F.3d at 484–87 (conducting a detailed claim-by-claim analysis to determine whether Davis had identified meaningful benchmarks).

Third, Riley and Reliford fail to explain how their footnoted argument—that the plan's recordkeeping costs are "clearly unreasonable" based on "some authorities" opining that large plans typically charge $35 per participant in recordkeeping fees—provides a meaningful comparison. As Defendants point out, Riley and Reliford's authorities consist of "expert opinions proffered by plaintiffs in other cases, an unspecified declaration, and the terms of a settlement agreement reached in another unrelated case." Doc. 20 at p. 13 (citing Doc. 1 at ¶ 85 n.8). The Court agrees that "[p]arty opinions and negotiated settlements concerning *different* and entirely *unrelated* plans say nothing about the reasonableness of the Plan's recordkeeping fees here," *id.* (emphasis added), because to hold otherwise would "permit[] plaintiffs to dodge the requirement for a meaningful benchmark . . . in exactly the way [the Eighth Circuit] warned against," *Meiners*, 898 F.3d at 823 ("[In *Braden*,] [w]e found that different shares of the same fund were a meaningful benchmark, but Meiners does not match that benchmark by alleging that cheaper alternative investments with *some* similarities exist in the marketplace."); *id.* at 823–24 (holding that the existence of "cheaper" alternatives does not, by itself, state a claim).

Finally, Riley and Reliford's assertions that the investment committee failed to conduct periodic requests for proposal and to renegotiate also do not cause the Court to draw an inference that the investment committee acted imprudently. For starters, "the allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation." *White v. Chevron Corp.*, No. 16-cv-793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).

9

While fiduciaries may need to utilize the request for proposal process under certain circumstances, the case on which Riley and Reliford rely on for support, *Allison v. L Brands, Inc.*, provides an inapt comparison. No. 2:20-cv-6018, 2021 WL 4224729, at *9 (S.D. Ohio Sept. 16, 2021). As Riley and Reliford themselves point out, the district court in that case denied the defendant's motion to dismiss because the plaintiff successfully "alleged that Plan participants paid recordkeeping fees significantly in excess of competitive terms for a period of at least six years, when information was available to Plan fiduciaries that could have mitigated or avoided these losses." *Id.*; Doc. 23 at p. 16.

As the Court explained above, the allegations in the complaint do not establish that the investment committee allowed Riley, Reliford, and the other plan participants to pay excessive fees. Thus, having considered the complaint in its totality, the Court concludes that Riley and Reliford do not state a breach-of-fiduciary-duty claim under an excessive-recordkeeping-fees theory.

### 2. Investment-management fees

As mentioned, Riley and Reliford allege that many of the plan's funds charge excessive investment-management fees and that "many of the [p]lan's investments were significantly more expensive than comparable funds found in similarly sized plans." Doc. 1 at ¶¶ 90–92. In support of these allegations, the complaint notes that many of the funds in the plan had expense ratios "significantly greater than the ICI median and ICI averages." *Id.* at ¶¶ 103–06. The complaint also alleges that "the Defendants could not have engaged in a prudent process" because the plan maintained several T. Rowe Price mutual funds despite the availability of cheaper, collective trust versions of the funds (which the plan eventually switched to). *Id.* at ¶ 103.

10

Riley and Reliford rely on the ICI median and ICI averages to support this claim. But "a complaint cannot simply make a bare allegation that costs are too high, or returns are too low. Rather, it 'must provide a sound basis for comparison—a meaningful benchmark.'" *Davis*, 960 F.3d at 478 (quoting *Meiners*, 898 F.3d at 822). The ICI data fails as such a benchmark. The ICI data on which Riley and Reliford rely apparently considers the plan size and the high-level "investment style" of each fund (for example, a target date fund, a domestic equity fund, or an index fund), but this does not suffice. The Eighth Circuit requires the Court to thoroughly compare challenged funds and putative benchmark funds with regard to fund holdings, investment style, and strategy—and neither the Plaintiffs nor the ICI data provide any of this required information. *Davis*, 960 F.3d at 484–87. For this reason, courts consistently conclude that the ICI data cannot serve as a "meaningful benchmark," and this Court agrees. *See, e.g.*, *Perkins*, 2022 WL 824839, at *6 (noting before agreeing that "several courts have rejected the Brightscope/ICI study median as a meaningful benchmark . . . because the ICI study does not distinguish between actively and passively managed accounts"); *Parmer*, 518 F. Supp. 3d at 1303 ("The court agrees with defendants and finds that the ICI Study median expense ratios are not meaningful benchmarks."); *Rosenkranz v. Altru Health Sys.*, No. 3:20-cv-168, 2021 WL 5868960, at *10 (D.N.D. Dec. 10, 2021) ("Accordingly, Plaintiffs have not sufficiently pleaded that the Committee breached the fiduciary duty of prudence by retaining the Challenged Funds when they had higher investment management fees than those listed in the ICI Median Report.").

Riley and Reliford respond that determining whether the ICI data suffices as a benchmark impermissibly drags the Court "into the factual weeds." Doc. 23 at pp. 17–18. Once more, the Court rejects this argument. Just like the Court's consideration of the NEPC survey above, at this stage the Court accepts as true the ICI's findings as alleged, yet need not accept as true Riley

11

and Reliford's legal conclusion that the survey serves as a meaningful benchmark against which to weigh the investment committee's actions. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

Riley and Reliford come closer, but ultimately fail to successfully allege that "the Defendants could not have engaged in a prudent process" with their bare allegation that the plan maintained several T. Rowe Price mutual funds despite the availability of cheaper, collective trust versions of the funds (which the plan eventually switched to). *Id.* at ¶ 103.  Without more, courts "routinely" find that collective trusts are not meaningful comparators to mutual funds because "collective trusts are subject to unique regulatory and transparency features that make a meaningful comparison impossible." *Parmer*, 518 F. Supp. 3d at 1305–06 (collecting cases). On the other hand, the Ninth Circuit recently reversed a district court that had dismissed a breach-of-fiduciary-duty claim that alleged that the defendants imprudently failed to select lower-cost collective investment trusts with *identical* underlying assets as the challenged mutual funds. *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) (unpublished).  However, in that case, the plaintiffs alleged that the challenged mutual fund and the collective investment trust had "the same underlying investments and asset allocations as their mutual fund counterparts but had better annual returns and a lower net expense ratio." *Id.* at *2 (internal quotation marks omitted); *see Davis*, 960 F.3d at 483 (holding that allegations defendant offered a "mixed" lineup of funds—where both lower-cost, institutional shares and *identical*, higher-cost retail shares are available for plan participants—state a breach-of-fiduciary-duty claim).  Riley and Reliford's complaint lacks any comparative allegations regarding plan investments, asset allocations, and the like—merely contending that the T. Rowe Price target-date collective investment trust had a lower expense ratio than the T. Rowe Price

target-date mutual funds.  Without more, these allegations do not state a claim.  Thus, having considered the complaint in its totality, the Court concludes that Riley and Reliford do not state a breach-of-fiduciary-duty claim under an excessive-investment-fees theory.

### 3. The one, underperforming fund

Finally, according to the complaint, the investment committee should have replaced one of the funds in the plan, the Eaton Vance Small/Mid Cap fund, because it underperformed.  As mentioned, in "an investment-by-investment challenge like this one, a complaint cannot simply make a bare allegation that costs are too high, or returns are too low.  Rather, it 'must provide a sound basis for comparison—a meaningful benchmark.'"  *Davis*, 960 F.3d at 478 (quoting *Meiners*, 898 F.3d at 822).

Riley and Reliford attempt to do so by comparing the Eaton Vance Small/Mid Cap fund's expense ratio and average annual return with another fund, the NCTWX Nicholas II I fund.  The complaint's comparison shows that the Eaton Vance fund had an expense ratio of 0.82% compared to the Nicholas II I fund's 0.60%.  As of June 30, 2020, the Eaton Vance fund's one-year, three-year, and five-year average annual returns were 43.02%, 15.62%, and 16.10%, with benchmark relative performance of -0.60%, -6.51%, and -4.16%, respectively.  On the other hand, as of June 30, 2020, the Nicholas II I fund's one-year, three-year, and five-year average annual returns were 37.56%, 17.34%, and 17.21%, with benchmark relative performance of -6.06%, -4.79%, and -3.05%, respectively.

This comparison at most establishes that Riley and Reliford's marginally cheaper, comparator fund performed better than Olin's selected fund at the three- and five-year marks.  But, of course, allegations "that costs are too high, or returns are too low" fail to support an inference of misconduct.  Moreover, "[a] prudently made decision is not actionable . . . even if it

13

leads to a bad outcome." *Davis*, 960 F.3d at 482.  For circumstantial allegations to support a breach-of-fiduciary-duty claim, the Eighth Circuit requires the Court to thoroughly compare the challenged fund with the putative benchmark fund, paying special attention to each fund's holdings, investment style, and strategy.  *Davis*, 960 F.3d at 484–87.  Here, Riley and Reliford fail to explain how their comparator, the Nicholas II I fund, provides a sound basis for comparison to the Eaton Vance Small/Mid Cap fund.  In fact, Riley and Reliford provide none of the information courts regularly consider when determining whether a plaintiff states an ERISA breach-of-fiduciary-duty claim, like fund prospectuses, *cf. id.* at 484 n.3 ("Like the district court, we consider the relevant fund prospectuses . . . ."); instead, Riley and Reliford allege only that the two funds are "in the same category," Doc. 1 at ¶ 108.

Riley and Reliford's sparse allegations do not provide a meaningful benchmark against which the Court can evaluate their claim.  Thus, having considered the complaint in its totality, the Court concludes that Riley and Reliford do not state a breach-of-fiduciary-duty claim under the theory that Olin retained an underperforming fund.

**B.     Failure-to-monitor claim**

Lastly, Olin and its board move to dismiss Riley and Reliford's derivative failure-to-monitor claim.  Riley and Reliford's only argument against dismissal presumes that they state a breach-of-fiduciary-duty claim against the investment committee.  Doc. 23 at p. 20.  Because they fail to state such a claim, the Court grants Olin and its board's motion to dismiss Riley and Reliford's failure-to-monitor claim.  *See Brown v. Medtronic*, 628 F.3d 451, 461 (8th Cir. 2010) ("[N]either of these [derivative] claims can survive without a sufficiently pled theory of an underlying breach.").

14

**IV.     Conclusion**

For the foregoing reasons, the complaint fails to state a claim. Thus, the Court grants the Defendants' [19] motion to dismiss, dismisses the complaint without prejudice, and denies Riley and Reliford's informal request for leave to amend their complaint. *See Misischia v. St. John's Mercy Health Sys.*, 457 F.3d 800, 805 (8th Cir. 2006) (holding that the district court does not abuse its discretion in denying leave to amend when plaintiff raises the issue "with a one-line request in his brief opposing defendants' motion to dismiss"); *see also* Judge's Requirements at p. 3. A separate order of dismissal accompanies this memorandum and order.

So Ordered this 21st day of June 2022.

*/s/ SLR. CR*
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE